Cite as 2019 Ark. App. 441

# ARKANSAS COURT OF APPEALS

DIVISION IV

No. CV-19-393

| | |
|---|---|
| AMANDA EASTER<br><br>APPELANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered:** October 2, 2019<br><br>APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT [NO. 15JV-17-50]<br><br>HONORABLE TERRY SULLIVAN, JUDGE<br><br>AFFIRMED |

## MIKE MURPHY, Judge

Appellant Amanda Easter appeals from the February 4, 2019 order of the Conway County Circuit Court terminating her parental rights to her children. Easter challenges the circuit court's findings on statutory grounds for termination and best interest. We find no error and affirm.

### I. *Procedural Facts and History*

Easter is the mother of KY (born 7/26/2016) and twins HE and NE (born 9/05/2012). HE and NE's legal father, Russell Easter, filed a consent to termination. KY's father is not a party to this appeal. This is not the first contact the Arkansas Department of Human Services (Department) has had with this family. In 2014, the twins spent six months in foster care due to environmental neglect and inadequate supervision resulting from Easter's use of methamphetamine.

On June 5, 2017, the Department exercised an emergency hold on the children and filed a petition for emergency custody and dependency-neglect two days later. The Department initiated an investigation into the welfare of the children after receiving information from a caller to its hotline that the children were being left alone while Easter "runs around the trailer park high on methamphetamine" and that two of the children had feeding tubes and were not being fed properly. The social worker who responded to the call determined that the children could not safely remain in the home because Easter tested positive for methamphetamine and appeared to be under the influence. The circuit court entered an ex parte order of emergency custody on June 7. On June 9, the circuit court held a probable-cause hearing, and it found that probable cause existed for the children to remain in the Department's custody.

At the adjudication hearing conducted on July 27, the court adjudicated the children dependent-neglected after Easter stipulated that the children had not been adequately supervised due to her drug use. The circuit court established a goal of reunification. Easter was ordered to comply with the standard welfare orders of the Department that, among other things, ordered her to submit to random drug screens, attend and complete parenting classes, obtain and maintain stable and appropriate housing and gainful employment, attend counseling, and submit to a drug-and-alcohol assessment.

At a review hearing on October 26, the court found that Easter had complied with the case plan but noted that she had not been able to maintain steady housing and employment. The goal of the case continued to be reunification.

At a February 1, 2018 review hearing, the court found that Easter had "substantially complied" with the case plan and the court's orders. The court noted specifically that she had submitted to a psychological evaluation as well as a drug-and-alcohol assessment but that she had elected to wait for inpatient treatment because the facility had a policy that prohibited romantic partners from being in the program simultaneously. Easter's boyfriend at the time, John Yard, was in the program but had recently left it prematurely. The order stated that they are no longer a couple. Also, Easter still did not have stable employment or housing. The goal of the case continued to be reunification.

At a permanency-planning hearing held on May 24, the goal of the case continued to be reunification, and the court found that Easter was substantially complying with the case plan. Specifically, the court found that Easter was compliant with her counseling, so it gave her an additional three months to work toward reunification.

At the fifteen-month review hearing, the circuit court changed the goal of the case to adoption with termination of parental rights. The circuit court found that Easter had only partially complied with the case plan and that she was employed but still did not have a suitable home for the children. The court specifically found she had lived in multiple residences during the pendency of the case and that she had not been compliant with her counseling.

In response to the change in goal, the Department filed a petition for termination on October 16 alleging the following grounds: (1) twelve month failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*) (Supp. 2017); (2) subsequent factors (Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*); and (3) aggravated circumstances—little likelihood of successful

3

reunification despite a reasonable offer of services. (Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*). The petition also alleged that termination was in the children's best interest.

At the termination hearing on January 17, 2019, Ashley Ryan, the family service worker assigned to the case, testified that Easter had completed inpatient drug treatment and was maintaining sobriety but was still minimally compliant with the court's orders. As of November, Ryan said Easter had attended four of thirteen counseling sessions. Ryan stated that the main thing that inhibited reunification was Easter's instability in employment and in housing. Throughout the case, it was always Easter moving in with somebody else. She was currently living with her boyfriend Donald Britton. At one point, they lived with Britton's mother and then moved in with Britton's father. Ryan opined that she did not consider Britton to be an appropriate person for the children to come home to; she noted that his employment was inconsistent like Easter's. Lastly, she mentioned the children's medical issues. When the children first went into foster care, KY, who was eleven months old, could not sit up and was on a feeding tube; the four-year-old twins were malnourished (HE had a feeding tube as well) and were not yet potty-trained. She also noted KY's hair-follicle test was positive for methamphetamine when she came into care. After being in foster care, KY is walking, the twins are fully potty trained, and none of the children have feeding tubes.

Easter testified and provided the address where she was living. She said she had the home in her possession since August 2018 but had to make repairs. She explained that the necessary repairs and she was nearly moved in at the time of the termination hearing. She

4

said she was employed, worked thirty-six to forty-eight hours per week, and had been employed at the same place since July 2018. She acknowledged she had to take a two-month medical leave but noted that she had returned to the same position. Easter agreed that she missed counseling sessions, but she stated it was because she was on medical leave. She said her medical leave also affected her ability to get housing sooner because she had to use her housing money to pay bills while not working, which required her to live with other people until she secured her current home. Easter also testified that she and Britton would be clean if tested for drugs, that Britton had a job pouring concrete, and that they had sufficient funds between the two of them to maintain the home. Lastly, she testified that she is not current on her child support and is about $4000 in arrears.

Britton testified that he had attended every visit with Easter since they had begun their relationship in October 2017 and that he cooperated with the single drug screen the Department had given him, which was negative. He verified Easter's testimony regarding the home they had moved into and he said he has a driver's license, a vehicle, insurance, and no other children.

Following the termination hearing, the circuit court entered an order terminating Easter's parental rights on all three grounds alleged in the Department's petition and as well as the court's best-interest finding, including its consideration of the adoptability of the children and the potential harm if they were returned to Easter's care. Easter now appeals the circuit court's order terminating her parental rights.

We review termination-of-parental-rights cases de novo. *Heath v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 255, at 5–6, 576 S.W.3d 86, 88–89. We review for clear

error, and a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* A court may order termination of parental rights if it finds clear and convincing evidence to support one or more statutory grounds listed in the Juvenile Code, Ark. Code Ann. § 9-27-341(b)(3)(B), and that termination is in the best interest of the child, taking into consideration the likelihood of adoption and the potential harm to the health and safety of the child that would be caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

## II. *Statutory Grounds*

Proof of only one statutory ground is sufficient to terminate parental rights. *Corley v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 397, at 4–5, 556 S.W.3d 538, 541–42. The subsequent-factors ground, codified at Arkansas Code Annotated § 9-27-341(b)(3)(B)(vii)*(a)*, provides that termination is appropriate when

> other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parents.

Easter argues that the court clearly erred in terminating her parental rights pursuant to the subsequent-factors ground. We disagree. Easter maintained her sobriety, yet she failed to follow the court's other orders. Throughout the case, Easter failed to show that she could maintain stability in housing and employment, which is enough to support the termination on the subsequent-factors ground. *See Gonzalez v. Ark. Dep't of Human Servs.*, 2018 Ark.

App. 425, at 9, 555 S.W.3d 915, 920 (holding that failure to comply with court orders can serve as a subsequent factor on which termination of parental rights can be based). During the entirety of the case, Easter never progressed enough to have unsupervised visitation. Easter did not get a job until July, which was almost a year into the case; consequently, she did not get her own home until August. However, at the January termination hearing, she testified that the home was only "90 percent" ready.[1] Her lack of urgency supports a finding of indifference to remedying subsequent factors despite appropriate family services being offered. *See Ewasiuk v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 59, at 18, 540 S.W.3d 318, 327. Thus, the circuit court's finding was not clearly erroneous.

Because only one statutory ground must be proved to support termination of parental rights, we do not address the other statutory grounds found by the circuit court. Ark. Code Ann. § 9-27-341(b)(3)(B).

III. *Best Interest*

In making a best-interest determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential harm to the child if custody is returned to a parent. *Miller v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 239, 492 S.W.3d 113.

On appeal, Easter does not challenge the adoptability finding, so we address only the potential-harm prong of the circuit court's best-interest finding. In assessing this factor, the

---

[1]We note that Easter's appellate brief puts forth arguments that are not supported by the record. Namely, counsel asserts that Easter "had moved into a home that was hazard free, and yet the caseworker failed to visit the home prior to the termination hearing." However, the record indicates that the caseworker reached out to Easter until the day before the hearing to visit the home, but Easter told her they were not all the way moved in.

7

circuit court is not required to find that actual harm would ensue if the child is returned to the parent or to affirmatively identify a potential harm. *James v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 445, at 15, 562 S.W.3d 218, 226. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability when not in a permanent home. *Gonzalez*, 2018 Ark. App. 425, at 12, 555 S.W.3d at 921. Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. *James*, 2018 Ark. App. 445, at 15, 562 S.W.3d at 226.

Easter's instability discussed above was sufficient to support the court's potential-harm finding. *See Rivera v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 405, at 16, 558 S.W.3d 876, 885 (holding that failure to provide stable housing and to comply with the court's orders demonstrates potential harm). Despite twenty months of services from the Department, Easter did not have a home that even she deemed appropriate for the children. This, coupled with the fact that the children had spent a significant portion of their lives in foster care, supports the circuit court's best-interest finding.

Accordingly, we cannot say that the circuit court clearly erred in terminating Easter's parental rights.

Affirmed.

GRUBER, C.J., and HARRISON, J., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Ellen K. Howard*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.

8